| FREDDIE ROBINSON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) ORDER |
| | ) |
| ROBERT LEWIS, Director of Prisons, | ) |
| N.C. Division of Adult Correction, | ) |
| | ) |
| Respondent. | ) |

This matter arises from the petition for writ of habeas corpus [D.E. # 1], pursuant to 28

U.S.C. § 2254, filed by petitioner Freddie Robinson. Petitioner is a state inmate under sentence

based upon "his convictions for felonious larceny and having attained the status of an habitual

felon." State v. Robinson, 716 S.E.2d 90, 2011 WL 3891041, *1 (N.C. Ct. App. Sept. 6, 2011)

(unpublished table decision). Presently before the court are respondent's motion for summary

judgment [D.E. # 6] and petitioner's response [D.E. # 22]. For the reasons that follow, the court

orders that the motion for summary judgment will be granted and the petition dismissed.

## STATEMENT OF THE CASE

Robinson was convicted in the Superior Court of Wake County on July 26, 2010. Pet. [D.E.

# 1] 1. The North Carolina Court of Appeals described the substantive and procedural facts

surrounding petitioner's conviction and sentence as follows:

At approximately 11:00 a.m. on 26 February 2009, Katrina Jenkins, manager
of the Raleigh Times Bar LLC, arrived at the restaurant, which opened for business

1

about thirty minutes later. After the end of the lunch shift, Ms. Jenkins ordinarily deposited the proceeds from the prior night's business at the bank. Until the daily deposit is made, a white Wachovia deposit bag containing the monies to be deposited and the employees' tips from the preceding evening were stored in a blue accordion folder placed in an unlocked file cabinet in the upstairs office.

At approximately 1:00 p.m., Jonathan Peedin, the husband of a Raleigh Times employee, noticed someone rummaging around in the office. After Mr. Peedin told Ms. Jenkins about his observations, they both saw Defendant "open the door and peek [his] head out, and close it again." At that point, Ms. Jenkins and Mr. Peedin watched Defendant move directly across the hall from the office to the restroom. As Defendant emerged from the restroom, Ms. Jenkins asked him if he needed help with something and patted his back to ascertain if the deposit bag was there. Ms. Jenkins noted that the Defendant was nervous and that the front of his clothes looked "bulky." After indicating that he had gotten lost while looking for the bathroom, Defendant left the restaurant.

While Mr. Peedin kept track of Defendant's location, Ms. Jenkins went to the office to check on the status of the deposit bag and discovered that it was missing. After making this discovery, Ms. Jenkins yelled to Mr. Peedin that Defendant had taken the money. At that point, both Ms. Jenkins and Mr. Peedin began pursuing Defendant. Upon looking over his shoulder and realizing that he was being chased, Defendant began to run down the street.

Initially, Defendant pretended that he was going to board a bus. Next, Defendant attempted to enter a parked car on Blount Street. After realizing that Ms. Jenkins and Mr. Peedin were still chasing him, Defendant shut the car door and continued his flight. At that point, Defendant was "fumbling around with his pants," making "it look[ ] pretty obvious [that] he [wa]s trying to keep something from falling down."

Mr. Peedin and Ms. Jenkins enlisted the aid of several construction workers during their pursuit of Defendant. After this assistance had been obtained, Ms. Jenkins stopped to call 911. As the chase continued, Defendant turned a corner and then "motion [ed] ... as if he ha[d] a pistol;" however, Defendant did not have a weapon in his possession. Shortly thereafter, Defendant went into the First Baptist Church.

After Defendant entered the church, George Flemming, a Bible study teacher at the church, saw him walk through the chapel and go upstairs. According to Mr. Fleming, Defendant remained on the second floor for approximately twenty minutes before returning to the first floor. According to Mr. Fleming, there were no events taking place on the second floor of the church that day.

2

Officer Steven Wilner of the Raleigh Police Department arrested Defendant at the rear of the church. Although he told Officer Wilner that he had entered the church for the sole purpose of locating a bathroom, Defendant refused to answer any questions when he was taken to the station.

Officers M. Walton and J.D. Ellington, also of the Raleigh Police Department, searched the First Baptist Church for the stolen money. During that process, Officer Walton noticed "some dirt which appeared to be like sheet rock dust" on the back of a toilet in the upstairs men's restroom. Upon examining the ceiling, Officer Walton noted that one of the ceiling tiles was slightly out of place, so he stood on a toilet, reached up into the ceiling, and discovered the Wachovia deposit bag. After reaching further into the ceiling, Officer Ellington discovered the accordion file containing the missing tips.

At that point, Officers Ellington and Walton returned the Wachovia deposit bag and the accordion file to Ms. Jenkins, who counted the money in the deposit bag and verified, using a computer printout, a signed bartender's receipt, and the deposit slip that was still in the deposit bag, that it contained the same $1,898.00 amount that had been received at the restaurant on the preceding evening. Although the blue accordion file contained $453.00, that amount could not be verified because there was no written record of the amount of tips that had been received by Raleigh Times employees and placed in the file folder. Officers Ellington and Walton gave the deposit bag and accordion file back to Ms. Jenkins, who signed a receipt stating that she received the property in question. Photographs of the Wachovia bag and the stolen currency were introduced into evidence at Defendant's trial for illustrative purposes.

On 26 February 2009, a warrant for arrest was issued charging Defendant with felonious larceny. On 4 May 2009, the Wake County grand jury returned a bill of indictment charging Defendant with felonious larceny. On 28 July 2009, the Wake county grand jury returned a bill of indictment charging Defendant with having attained the status of an habitual felon.

The charges against Defendant came on for trial before the trial court and a jury at the 22 July 2010 criminal session of the Wake County Superior Court. Prior to trial, Defendant filed a motion seeking to either have the photographs of the allegedly stolen bank bag and currency suppressed pursuant to N.C. Gen.Stat. § 15A–825(3) or the charges against Defendant dismissed on the grounds that investigating officers unlawfully failed to preserve the cash and deposit bag that were recovered from the bathroom ceiling. The trial court denied Defendant's motion. On 26 July 2010, the jury returned a verdict finding Defendant guilty of felonious larceny.

3

After the jury convicted Defendant of felonious larceny, Defendant unsuccessfully sought to have the habitual felon charge dismissed on the grounds that sentencing him as an habitual felon would result in the imposition of cruel and unusual punishment. Following the presentation of evidence and the arguments of the parties at the habitual felon proceeding, the jury returned a verdict finding that Defendant had attained habitual felon status.

At the ensuing sentencing hearing, the trial court found that Defendant had accumulated seventeen prior record points and should be sentenced as a Level V offender. Based upon these determinations, the trial court sentenced Defendant to a minimum term of 121 months and a maximum term of 155 months imprisonment in the custody of the North Carolina Department of Correction. Defendant noted an appeal to this Court from the trial court's judgment.

Robinson, 2011 WL 3891041 at *1-*3.

Petitioner appealed to the North Carolina Court of Appeals, arguing that the trial court erred

by

(1) refusing to dismiss the felonious larceny charge that had been lodged against him for insufficiency of the evidence; (2) denying his motion to suppress photographs of a Wachovia bank bag, tip folder and United States currency; (3) refusing to intervene in the absence of an objection to preclude the presentation of testimony tending to show that Defendant refused to make a statement after being taken into custody; (4) failing to deliver a curative instruction to the effect that the jury should not consider the testimony concerning Defendant's refusal to make a statement to investigating officers in deciding the issue of his guilt; and (5) refusing to dismiss the habitual felon indictment as violative of the provisions of the federal and state constitutions prohibiting cruel and unusual punishment.

Id. at *1. The Court of Appeals found that petitioner "received a fair trial that was free from prejudicial error and that [his] challenges to the trial court's judgment lack merit" and therefore affirmed his conviction and sentence. Id. at *9. Petitioner did not file a notice of appeal or a petition for discretionary review with the North Carolina Supreme Court. Instead, on October 3, 2011, he filed a motion for appointment of counsel, which was denied on December 8, 2011. State v. Robinson, 365 N.C. 368, 719 S.E.2d 47 (N.C. 2011). Petitioner did not file a motion for appropriate

4

relief or other form of post-conviction relief in the state courts before filing the instant federal habeas corpus petition on January 19, 2012, at the earliest. On June 12, 2012, respondent filed his motion for summary judgment and supporting memorandum with exhibits. On October 1, 2012, petitioner filed his response. The matter is now ripe for ruling.

## DISCUSSION

I. Standard of Review

A. Summary Judgment

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp, 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B. Section 2254(d)

To the extent petitioner's claims were decided on the merits in the state court, the court's review is governed by 28 U.S.C. § 2254(d), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104, 132, 110 Stat. 1214 (1996). Section 2254(d) provides as follows:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of

5

the claim-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The phrase "'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decisions." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412-13. A state court decision "involve[s] an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Likewise, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. __, __, 130 S.Ct. 841, 849 (2010). See also Winston v. Kelly, 592 F.3d 535, 554 (4th Cir. 2010) ("For a state court's factual determination to be unreasonable under §

6

2254(d)(2), it must be more than merely incorrect or erroneous. It must be sufficiently against the weight of the evidence that it is objectively unreasonable.") (citing Schriro v. Landrigan, 550 U.S. 465, 474 (2007)). Thus, while "deference [in the habeas context] does not imply abandonment or abdication of judicial review" and does not "preclude relief," Miller-El v. Cockrell, 537 U.S. 322, 340 (2003), the deferential standard imposed by § 2254(d), as to both legal conclusions and factual determinations by the state courts, erects a substantial bar for state inmates seeking habeas relief in federal court.[1]

The statute "does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one." Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000). If the state court did not articulate the rationale underlying its adjudication, a federal habeas court must examine the record and the clearly established Supreme Court precedent to determine whether the state court's adjudication was contrary to, or involved an unreasonable application of, clearly established federal law. Id. at 158. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state

---

[1]    In this vein, the Supreme Court recently observed as follows:

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no probability fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. Jackson v. Virginia, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, 562 U.S. __, __, 131 S.Ct. 770, 786-87 (2011).

court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 562 U.S. at __, 131 S.Ct. at 784-85. Finally, the factual findings of the state court are presumed to be correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting this presumption by clear and convincing evidence. Fisher v. Lee, 215 F.3d 438, 445 (4th Cir. 2000).

Only after a petitioner establishes that the state court's adjudication of his claims was "contrary to" or an "unreasonable application of" clearly established federal law, or was "based on an unreasonable determination of the facts in light of the evidence," may a federal court proceed to review a state court judgment independently to determine whether habeas relief is warranted. Rose v. Lee, 252 F.3d 676, 689-90 (4th Cir. 2001). See also Frazer v. South Carolina, 430 F.3d 696, 718 (4th Cir. 2005) ("Because the state court's decision in this case was both contrary to and involved an unreasonable application of clearly established federal law, the district court properly reviewed Frazier's claim *de novo*."); Lynch v. Polk, 204 F. App'x 167, 170 (4th Cir. 2006) (unpublished decision) ("If a legal or factual error of the degree specified in § 2254(d)(1) or (d)(2) occurred, then a federal court has the obligation to conduct an independent review of the petitioner's claims to determine whether the issuance of a writ is warranted.").

C.     Procedural Default

In addition to arguing that petitioner's claims cannot survive § 2254(d) review where it is applicable, respondent also asserts that petitioner has procedurally defaulted his claims because he either failed to preserve them for appellate review, resulting in the Court of Appeals application of plain error review, or because he failed to fully exhaust them.

The doctrine of procedural default provides that "a federal habeas court may

8

not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule." Burket v. Angelone, 208 F.3d 172, 183 (4th Cir.2000). A state procedural rule is adequate if it is regularly or consistently applied by the state courts, Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and it is independent if it does not depend on a federal constitutional ruling, Ake v. Oklahoma, 470 U.S. 68, 75 (1985). Where a state procedural rule is both adequate and independent, it will bar consideration of the merits of claims on habeas review unless the petitioner demonstrates cause for the default and prejudice resulting therefrom or that a failure to consider the claims will result in a fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 750 (1991).

McNeil v. Polk, 476 F.3d 206, 211 (4th Cir. 2007).

Respondent asserts that certain of petitioner's claims are procedurally defaulted due to his

failure to exhaust such claims by presenting them in a properly executed petition for discretionary

review to the North Carolina Supreme Court after his direct appeal to the North Carolina Court of

Appeals was denied. A prisoner is required to exhaust remedies available to him in state court

before he files a writ of habeas corpus in federal court. See § 2254(b)(1)(A). The Fourth Circuit has

described the contours of this exhaustion requirement as follows:

Of course, it is true that "[b]efore seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citation and internal quotation marks omitted); see also Breard v. Pruett, 134 F.3d 615, 619 (4th Cir.1998). To provide the state with this opportunity, "the prisoner must 'fairly present' his claim in each appropriate state court . . . , thereby alerting that court to the federal nature of the claim." Reese, 541 U.S. at 29; see also Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir.1997). The habeas petitioner must raise his claim before every available state court, including those courts [ ] whose review is discretionary. O'Sullivan v. Boerckel, 526 U.S. 838, 847 (1999).

Jones v. Sussex I State Prison, 591 F.3d 707, 712-13 (4th Cir. 2010). A habeas petitioner's failure

to exhaust his remedies in state court may preclude review of his claims in federal court. "A

procedural default . . . occurs when a habeas petitioner fails to exhaust available remedies and 'the

9

court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" Breard, 134 F.3d at 619 (quoting Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)).

In North Carolina, a non-capital defendant may satisfy the exhaustion requirement for federal habeas purposes by directly appealing his conviction to the North Carolina Court of Appeals and, if unsuccessful in that venue, petitioning the Supreme Court of North Carolina for discretionary review pursuant to N.C.G.S. § 7A-31. In the post-conviction context, a petitioner in North Carolina may exhaust his federal claims by filing a MAR in the appropriate circuit court and then filing a petition for certiorari review of any adverse decision with the Court of Appeals pursuant to N.C.G.S. § 15A-1422. Because "[t]he burden of proving that a claim is exhausted lies with the habeas petitioner," Breard, 134 F.3d at 619, absent a showing by petitioner that his instant federal claims followed along one of these two tracks to completion of review in the state courts, his claims are subject to procedural default.

In general, a "procedural default is excusable under the cause and prejudice standard when the petitioner demonstrates (1) that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule, and (2) that errors at his trial . . . worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." Wolfe v. Johnson, 565 F.3d 140, 158 n.27 (4th Cir. 2009) (internal quotations and citations omitted).

II. Petitioner's Claims

Petitioner appears to raise the following claims in his federal habeas petition: 1) "conviction obtained by the admission of photographic evidence in violation to 14th Amendment;" 2)

10

"conviction obtained by use of evidence on the petitioner's post-arrest silence in violation to 5th and 14th Am.;" 3) "conviction obtained by insufficient evidence in violation to 5th, 6th and 14th Am.;" and 4) "sentence obtained by the use of an habitual felon status in violation to the 8th Am." Pet. [D.E. # 1] 5-10.

III.    Analysis

Respondent contends that petitioner's claims are procedurally defaulted, do not satisfy the deferential standard enunciated in § 2254(d) where it is applicable, are otherwise lacking in merit, and fail to survive the harmless error review required by Brecht v. Abrahamson, 507 U.S. 619, 631 (1993), where applicable. Resp.'s Supp. Mem. [D.E. # 7] 5-21. The court will first address respondent's contention that petitioner has procedurally defaulted each of his claims due to his failure to present them in a petition for discretionary review to the North Carolina Supreme Court after the Court of Appeals denied his direct appeal.

A.      Failure to Exhaust and Procedural Default

As set forth above, in order to exhaust his claims for purposes of federal habeas corpus review, petitioner was required to present them in a petition for discretionary review ("PDR") to the North Carolina Supreme Court pursuant to N.C.G.S. § 7A-31 after the claims were denied on direct appeal to the North Carolina Court of Appeals. Respondent argues that petitioner's failure to file such a PDR renders them unexhausted and, therefore, procedurally defaulted in federal habeas corpus. Petitioner concedes that he did not file a PDR, but asserts two separate reasons why this failure should not result in the procedural default of his claims.

First, petitioner argues that he "believe[d] that he did not have to seek appellate review from the state highest court . . . because [the] Court of Appeals, which also has appellate

11

jurisdiction–heard and rejected petitioner's constitutional trial challenges on direct appeal." Pet. 11. Petitioner's first argument is unavailing. The United States Supreme Court instructs that "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" to include "petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State." O'Sullivan, 526 U.S. at 845, 847. Hence petitioner did not exhaust his claims merely by presenting them to the North Carolina Court of Appeals, and any ignorance which may have caused him to fail to fully exhaust his claims cannot provide "cause" for his failure to exhaust.

Petitioner's second argument is that he

> actually attempted to appeal to said highest state court, as a matter of right due to said Court of Appeals rejections of said constitutional issues pursuant to N.C.G.S. 7A-30(1) [sic], by filing for a "Motion for Appointment of Counsel" to said highest state court under entitlement pursuant to N.C.G.S. 7A-451(b)(6) to file said notice of appeal and briefs therein. However, said highest state court denied said motion for counsel. This denial from said highest state court clearly demonstrates said court refusal to hear and determine said constitutional challenges, denying petitioner access to the court, and denying petitioner to effective assistance of appellate counsel[.]

Pet. 11-12. Petitioner apparently believes that he was entitled to an appeal as of right from the Court of Appeals' judgment pursuant to N.C.G.S. § 7A-30. That provision allows for such appeals only in cases which "directly involve[] a substantial question arising under the Constitution of the United States or this State" or in which there was a dissent in the Court of Appeals. Pursuant to N.C.G.S. § 7A-451(b)(6), a criminal defendant is entitled to appointed counsel in any appeal as of right to the North Carolina Supreme Court pursuant to § 7A-30.

As a preliminary matter, petitioner has failed to show that his filing of a "Motion for

12

Appointment of Counsel" could suffice under North Carolina law as the requisite notice of appeal for purposes of § 7A-30(1). There simply is no authority for the proposition that a motion for appointment of counsel may be substituted for a proper notice of appeal.[2] Moreover, petitioner misinterprets the relevant provisions of state law. He was not entitled to an appeal as of right pursuant to § 7A-30(1) on the basis that his appeal presented a "substantial question" arising under the state or federal Constitutions. Under North Carolina law, a defendant-appellant is not empowered to unilaterally declare his appeal as one presenting such a "substantial question." Were that the case, § 7A-30 would be rendered meaningless, as any defendant-appellant could simply so designate their appeal in order to obtain further review by the North Carolina Supreme Court. Rather, the power to determine whether a case presents a "substantial question" lies only with the Court, as that body commonly dismisses notices of appeal filed pursuant to § 7A-30(1) for lack of a substantial constitutional question. See, e.g., State v. Mayes, 323 N.C. 159, 161, 371 S.E.2d 476, 477 (N.C. 1988) ("We allowed the State's motion to dismiss the appeal for lack of a substantial constitutional question . . . ."). Thus, petitioner may not simply deem his appeal as one pursuant to § 7A-30(1) and demand the appointment of counsel to assist with the appeal. It is for this reason that criminal defendants in North Carolina routinely file both a notice of appeal pursuant to § 7A-30(1) and a petition for discretionary review pursuant to § 7A-31. See id.; State v. Ellison, 722 S.E.2d 594 (N.C. 2012) (granting motion to dismiss notice of appeal filed pursuant to § 7A-30 but granting

---

[2] As noted above, "[t]he burden of proving that a claim is exhausted lies with the habeas petitioner." Breard, 134 F.3d at 619. However, petitioner has not provided the court with a copy of the motion for appointment of counsel which he filed in the North Carolina Supreme Court, or even marginally described the contents of the motion, so that the court may assess whether that filing "fairly presented" or even alluded to petitioner's current constitutional claims, albeit in an improper context.

13

simultaneously filed petition for discretionary review of Court of Appeals' decision). This practice ensures that the defendant-appellant will exhaust his constitutional claims for purposes of subsequent federal habeas corpus review in the event that the North Carolina Supreme Court dismisses the notice of appeal filed pursuant to § 7A-30.

Ultimately, petitioner failed to comply with North Carolina law for presenting an appeal to the North Carolina Supreme Court pursuant to § 7A-30(1). Because he also did not file a PDR pursuant to § 7A-31, petitioner has failed to fairly present and exhaust his current constitutional claims in the state courts. If petitioner were to attempt to return to state court and raise his claims through the filing of a MAR, the MAR would be procedurally barred pursuant to N.C.G.S. § 15A-1419(a)(3). Section 15A-1419(a)(3)'s procedural default rule is an adequate and independent state ground for purposes of precluding federal habeas review. See Lawrence v. Branker, 517 F.3d 700, 714-15 (4th Cir. 2008). Accordingly, petitioner's claims are procedurally defaulted due to his failure to exhaust the claims in state court, and respondent is entitled to summary judgment on that basis. In the alternative, however, for the reasons that follow, petitioner's claims are devoid of merit and subject to dismissal on that basis as well.

B.     Merits

1.     Ground One

Petitioner's first claim is that his "conviction [was] obtained by the admission of photographic loss evidence in violation to 14th Amendment." Pet. 5. In support, he alleges that, rather than conducting forensic testing or preserving the physical evidence, the police officers who recovered the stolen currency merely counted and photographed it before returning it to the rightful owners. Pet. 13. Petitioner appears to argue that admission of the photographs and the failure to

14

preserve the currency as evidence deprived him of due process in that he could not prepare an

adequate defense because the currency was unable to be tested for evidence of fingerprints or other

exculpatory evidence. Id. at 14.

On direct appeal, the state court rejected petitioner's assertion of a due process violation.

> On appeal, Defendant contends that his due process rights were violated by
> virtue of the fact that the deposit bag, file folder, and currency were not properly
> preserved for introduction into evidence at trial. "In considering the effect, if any, of
> the release of this evidence, such inquiry must focus on the question of whether
> defendant was thereby deprived of his rights to due process under the Fourteenth
> Amendment to the United States Constitution and Article I, Sections 19 and 23 of the
> North Carolina Constitution." State v. Mlo, 335 N.C. 353, 372, 440 S.E.2d 98, 107
> (1994), cert. denied, 512 U.S. 1224 (1994). According to well-established federal
> and state law, however, "[t]he constitutional duty imposed on the State to preserve
> evidence is 'limited to evidence that might be expected to play a significant role in
> the suspect's defense.'" State v. Banks, 125 N.C.App. 681, 683, 482 S.E.2d 41, 43
> (quoting California v. Trombetta, 467 U.S. 479, 488 (1984)), aff' d, 347 N.C. 390,
> 493 S.E.2d 58 (1997), cert. denied, 523 U.S. 1128 (1998). In such instances,
> "[e]vidence is considered 'material' if there is a 'reasonable probability' of a different
> result had the evidence been disclosed." State v. Berry, 356 N.C. 490, 517, 573
> S.E.2d 132, 149 (2002) (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)).
> Moreover, in Arizona v. Youngblood, 488 U.S. 51, 57–58 (1988), the United States
> Supreme Court held that
>
>> [t]he Due Process Clause of the Fourteenth Amendment ... makes the
>> good or bad faith of the State irrelevant when the State fails to
>> disclose to the defendant material exculpatory evidence. But we think
>> the Due Process Clause requires a different result when we deal with
>> the failure of the State to preserve evidentiary material of which no
>> more can be said than that it could have been subjected to tests, the
>> results of which might have exonerated the defendant.... We therefore
>> hold that unless a criminal defendant can show bad faith on the part
>> of the police, failure to preserve potentially useful evidence does not
>> constitute a denial of due process of law.
>
> As a result, in order to obtain relief on appeal on the basis of his challenge to the
> State's decision to return the Wachovia bag, file folder, and currency to employees
> of the Raleigh Times, we conclude that Defendant must establish either that the
> evidence in question would have played a significant role in Defendant's defense or
> that the State acted in bad faith at the time that it decided to return this evidence to
> employees of the Raleigh Times instead of preserving it for use at trial.

15

After carefully reviewing the record, we do not believe that the evidence in question would have played a significant role in Defendant's defense. Although Defendant argues that he had no opportunity to obtain an independent examination of the evidence, that this evidence might have been subjected to fingerprint analysis had it been retained for use at trial, and that such analysis, if it failed to reveal Defendant's fingerprints on the bag, the accordion file, or the currency might have allowed Defendant to argue to the jury that he never possessed the bag. We conclude, however, that, given the overwhelming evidence against Defendant, the absence of fingerprints on the stolen items would not have changed the result in this trial. As a result, notwithstanding Defendant's contention that fingerprint testing might have yielded potentially exculpatory evidence, we conclude that the evidence was not material. As a result, particularly given the extensive evidence tending to identify Defendant as the perpetrator of the theft from the Raleigh Times, the record simply does not support Defendant's contention that the investigating officers' decision to return the bag bank, file folder, and currency to employees of the Raleigh Times resulted in the loss of material exculpatory evidence.[FN2]

> [FN2. In addition, Defendant argues that the failure to retain the currency precluded any independent calculation of the amount of money that was taken from the Raleigh Times. However, given that Ms. Jenkins had an independent basis for determining that more than $1,000.00 was taken in the theft and that Defendant's defense at trial was focused on the issue of identity rather than the amount of money taken in the course of the theft, we are unable to say that the currency that was returned to employees of the Raleigh Times constituted material exculpatory evidence for this reason either.]

Moreover, the record contains no indication that the investigating officers acted in bad faith when they decided to return the deposit bag, file folder, and currency to employees of the Raleigh Times instead of retaining it for use at trial. Officer Walton indicated that established department procedure required him to return stolen property to the rightful owner after that property had been properly documented and photographed. According to Ms. Jenkins, the amount of money retrieved from the bathroom ceiling at the First Baptist Church was the same amount that had been received at the restaurant on the preceding evening. The officers' conduct in returning the stolen property to its rightful owner certainly does not rise to the level of bad faith, and the record is devoid of any other showing of bad faith in the officers' actions. Thus, for all of these reasons, this argument lacks merit.

Robinson, 2011 WL 3891041 at *5-*6.

The state court correctly identified the constitutional principles raised by petitioner's claim

16

and applied governing Supreme Court precedent appropriately. See Youngblood, 488 U.S. at 57-58; Trombetta, 467 U.S. at 486-88. Petitioner has simply failed to plausibly contend that the recovering police officers' actions in returning the stolen funds to the victim were in bad faith as required by Youngblood. Officer Walton testified that the currency was returned to its rightful owners after it was recovered, processed, catalogued, and photographed pursuant to Raleigh Police Department policy. See Trial Tr. 29-30, ex. 6 to Resp.'s Supp. Mem. [D.E. # 7-7]. Petitioner nevertheless asserts that the requisite "bad faith" may be inferred from the officers' testimony that they did not preserve the evidence or subject it to testing because they believed this "was an open-and-shut case, and made statements that if there was no fingerprints that a defendant may use the lack of as a defense . . . ." Pet. 14.

While Officer Walton did testify that he did not test for fingerprints on the stolen deposit bag because he considered the matter "open-and-shut," Trial Tr. 34, there is no constitutional requirement that all physical evidence be subjected to forensic testing such that the failure to conduct such testing could constitute bad faith. Moreover, petitioner has failed to point to any specific portion of the record in which Officer Walton or any other witness speculated that failing to test for fingerprints would somehow benefit the State or work to its strategic advantage. In fact, petitioner, who represented himself at trial, argued to the jury that the lack of any evidence of his own fingerprints on the stolen property provided reasonable doubt of his guilt. See, e.g., Trial Tr. 89 ("She never tells you that they took fingerprints of anything. Wouldn't you suppose if I'm in possession of something that they would have fingerprints on it. She never told you that they were going to present any fingerprints that shows that I was in possession of this stolen property.").

The state court's decision is therefore neither contrary to or an unreasonable application of

17

Supreme Court precedent, and it is not based upon an unreasonable determination in light of the facts before the court. Accordingly, this claim is devoid of merit and respondent is entitled to summary judgment on Ground One.

2.    Ground Two

In Ground Two, petitioner claims his "conviction [was] obtained by use of evidence on the petitioner's post-arrest silence in violation to 5th and 14th Am." Pet. 6. In support, he argues he did not "receive a fair trial and that his due process rights was continuously being violated, by the prosecution's extractions from state witnesses testimonial comments on petitioner's arrest and post-arrest silence." Pet. 16.

Although petitioner did not object to these purported comments on his silence at trial, he did raise this claim on direct appeal. Applying plain error review, the Court of Appeals held as follows:

> According to Defendant, investigating officers commented on his refusal to answer questions or make a statement following his arrest on several occasions during his trial. More specifically, Officer Wilner testified that:
>
> Q. Once you took him downtown, was he formally charged and processed?
>
> A. He was interviewed or we attempted to interview him at the main station, and then he refused to answer any questions. And then I took him down to the Wake County Jail for processing.
> . . . .
>
> Q. Did he make any statements when he was downtown related to the offense for which he'd been arrested?
>
> A. No.
>
> Similarly, Officer Ellington testified that:
>
> Q. Okay. And at some point, did you go back to the church?
>
> A. Yes, I had—in speaking to Officer Wilner and Detective Arnold, the

18

suspect did not want to make a statement. After being very frustrated, feeling defeated, I made a comment to my sergeant that that money is in that church somewhere. . . . .

. . . .

Q. Did you have any other duties in this matter?

A. Other than maintaining communication with Officer Wilner who was with the suspect, letting him know we had recovered the money and at that point, Mr. Robinson was not willing to give a statement. Therefore, I told Officer Wilner you can tell Mr. Robinson that we found the money in the ceiling over the toilet in the men's bathroom, mainly because we were concerned he was going to go back into the church again.

Q. Thank you. Did you ever at any time have specific contact or conversation with the Defendant in this case?

A. No, I did not.

Defendant did not object to any of this testimony or request that the jury be instructed to disregard it.

"It is well established that a criminal defendant has a right to remain silent under the Fifth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment, and under Article I, Section 23 of the North Carolina Constitution." State v. Ward, 354 N.C. 231, 266, 555 S.E.2d 251, 273 (2001) (citing State v. Mitchell, 353 N.C. 309, 326, 543 S.E.2d 830, 840, cert. denied, 534 U.S. 1000 (2001)). "A defendant's exercise of this right may not be used against him, and any reference by the State to a defendant's failure to testify violates that defendant's constitutional rights." Mitchell, 353 N.C. at 326, 543 S.E.2d at 840. The Supreme Court has "consistently . . . held that when the trial court fails to give a curative instruction to the jury concerning the prosecution's improper comment on a defendant's failure to testify, the prejudicial effect of such an uncured, improper reference mandates the granting of a new trial." State v. Reid, 334 N.C. 551, 556, 434 S.E.2d 193, 197 (1993) (citations omitted).

In Mitchell, the Supreme Court determined that a prosecutor's improper reference to the defendant's post-arrest silence did not mandate an award of appellate relief. Instead, the Supreme Court stated that, "[a]ssuming arguendo that the prosecutor's comment in the present case was error, we conclude, in light of the overwhelming evidence of defendant's guilt, that the prosecutorial error and the trial court's failure to intervene *ex mero motu* were harmless beyond a reasonable doubt." Mitchell, 353 N.C. at 326, 543 S.E.2d at 841. "Unless there is a reasonable

19

possibility that the evidence complained of might have contributed to the conviction, its admission is harmless." State v. Castor, 285 N.C. 286, 292, 204 S.E.2d 848, 853 (1974) (citation omitted). The logic adopted in Mitchell and Castor indicates that the same result is appropriate here. As we have already noted, the evidence against Defendant was exceedingly strong, if not overwhelming. The testimony upon which Defendant's claims are based was factual in nature and did not overtly suggest that an inference of Defendant's guilt should be drawn from his refusal to give a statement to investigating officers following his arrest. Simply put, Defendant has failed to show that, absent the comments about his silence or the delivery of an appropriate curative instruction, the jury would have reached a different verdict. As a result, the trial court did not commit plain error by failing to either intervene *ex mero motu* at the time that Officers Wilner and Ellington testified that Defendant had refused to make a statement in the aftermath of his arrest or to deliver a curative instruction despite the absence of a request that such an instruction be given.

Robinson, 2011 WL 3891041 at \*6-\*8.

As determined by the North Carolina Court of Appeals, any purported comment on petitioner's silence was at most only fleeting. Moreover, petitioner points to no evidence in the record that the State emphasized his silence during closing arguments to the jury. Thus, for the reasons identified by the North Carolina Court of Appeals, including the "exceedingly strong, if not overwhelming" circumstantial evidence of petitioner's guilt and the lack of any overt suggestion that petitioner's guilt should be inferred from his silence, petitioner's claim that his conviction was obtained due to the supposed comments on his silence is without merit. The state court's decision rejecting this claim is therefore neither contrary to or an unreasonable application of Supreme Court precedent, and it is not based upon an unreasonable determination of the facts before the state court. See Chapman v. California, 386 U.S. 18, 24 (1967) (holding "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt," and finding that comments on silence were not harmless when "the state prosecutor's argument and the trial judge's instruction to the jury continuously and repeatedly

impressed the jury that from the failure of petitioners to testify, to all intents and purposes, the inferences from the facts in evidence had to be drawn in favor of the State–in short, that by their silence petitioners had served as irrefutable witnesses against themselves.").

In addition, for the same reasons articulated by the North Carolina Court of Appeals, the court finds that any error in allowing the State's witnesses to comment on petitioner's failure to testify and in failing to provide a curative instruction did not have a "substantial and injurious effect or influence in determining the jury's verdict." Kotteakos v. United States, 328 U.S. 750, 766 (1946). Thus, the purported error was harmless pursuant to the "less onerous" Brecht standard governing habeas review of claims of constitutional error during state court trials. See Brecht, 507 U.S. at 637-38. Accordingly, petitioner is not entitled to habeas corpus relief on his claim that his conviction was obtained due to unconstitutional references to his post-arrest silence and respondent is entitled to summary judgment on Ground Two.

### 3. Ground Three

In Ground Three, petitioner claims that his "conviction [was] obtained by insufficient evidence in violation to 5th, 6th, and 14th Am." Pet. 8. In support, he first states that the prosecution failed to "prove six elements of the crime of felonious larceny by means of sufficient evidence." Pet. 18. He then argues that the evidence presented at trial "reflects no more than a surmise, conjecture, or mere suspicion of guilt on the part of the petitioner, thus, was not constitutionally sufficient to convict on said larceny charge." Id. at 19. Specifically, petitioner argues that the fact that "the prosecution case relies upon the testimony of state witnesses and said photo pictures of said Wachovia bank bag and currency, rather than the actual physical evidence of said stolen property" indicates that there is insufficient evidence in support of his conviction. Id.

21

Rather than challenging the sufficiency of the State's proof as to any discrete element of the offenses for which he was convicted, petitioner's claim appears to argue that the evidence is insufficient because it is largely circumstantial, rather than direct, physical evidence. The state court considered and rejected this claim on direct appeal.

Defendant was convicted of a felonious larceny made punishable by N.C. Gen. Stat § 14–72(a), which provides, in pertinent part, that "[l]arceny of goods of the value of more than one thousand dollars ($1,000) is a Class H felony." A determination that a defendant is guilty of felonious larceny requires proof of "(1) the taking of the property of another; (2) carrying it away; (3) without the owner's consent; and (4) with the intent to permanently deprive the owner of the property." State v. Barbour, 153 N.C.App. 500, 502, 570 S.E.2d 126, 127 (2002) (citing State v. Perry, 305 N.C. 225, 233, 287 S.E.2d 810, 815 (1982), overruled in part on other grounds in State v. Mumford, 364 N.C. 394, 402, 699 S.E.2d 911, 916 (2010)). In challenging his conviction, Defendant argues that the record evidence raises nothing more than a surmise or conjecture of guilt and should, for that reason, be deemed insufficient to withstand a motion to dismiss. More specifically, Defendant contends that the record evidence does not suffice to show that he was the perpetrator of the theft from the Raleigh Times or that he had actual or constructive possession of the stolen goods. We disagree.

As a careful review of the record clearly shows, Mr. Peedin spotted Defendant rummaging around in the upstairs office of the Raleigh Times despite the fact that Defendant was not authorized to be in that location. At that time, Defendant was acting in a suspicious manner, "peek[ing][his] head out" from behind the door and then crossing the hall to enter the men's bathroom, where he remained for several minutes. According to Ms. Jenkins, Defendant appeared to be nervous at the time that he left the bathroom. In addition, Ms. Jenkins noticed that Defendant's clothes looked "bulky," and, upon Defendant's departure, discovered that the deposit bag was missing. After Defendant realized that Ms. Jenkins and Mr. Peedin were following him, he began to run, taking a circuitous route that took him through parking lots, a bus terminal, and various streets before reaching First Baptist Church. As he ran, Mr. Peedin testified that Defendant was "fumbling around with his pants, as if ... he's trying to keep something from falling down."

At the First Baptist Church, Mr. Fleming observed Defendant going up to the second floor, where he remained for approximately twenty minutes despite the fact that there were no events taking place on that floor on that particular day. Upon being taken into custody, Defendant said that he had been looking for a bathroom on the second floor. Subsequently, Officers Wilner and Ellington discovered the stolen

22

items in the ceiling of the second floor bathroom.

> "It is well settled that all of the essential elements of larceny ... can be proved by circumstantial evidence where the circumstance raises a logical inference of the fact to be proved and not just a mere suspicion or conjecture." State v. Boomer, 33 N.C.App. 324, 327–28, 235 S.E.2d 284, 286 (citing State v. Delk, 212 N.C. 631, 194 S.E. 94 (1937)), cert. denied, 293 N.C. 254, 237 S.E.2d 536 (1977). In this case, a reasonable juror could logically infer that Defendant took the stolen items and then hid them in the First Baptist Church. Contrary to Defendant's argument, the record contains ample evidence tending to show Defendant's identity as the perpetrator of the theft and his actual possession of the stolen property. As we understand the record, the evidence tending to show Defendant's guilt was exceedingly strong. As a result, the trial court did not err by declining to dismiss the felonious larceny charge that had been lodged against Defendant.

Robinson, 2011 WL 3891041 at *3-*4. The state court's finding that circumstantial evidence and

the reasonable, logical inferences therefrom may support a conviction is not contrary to or an

unreasonable application of Supreme Court precedent. Nor was the state court's assessment that the

circumstantial evidence adduced at trial was sufficient to support an inference of petitioner's guilt

based upon an unreasonable determination of the facts before the court. As such, the North Carolina

Court of Appeals' decision rejecting this claim must be upheld pursuant to § 2254(d). See Jackson

v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original) (holding that, when reviewing the

sufficiency of the evidence, the question is "whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt."). Respondent is entitled to summary judgment on Ground Three.

    4.    Ground Four

Petitioner's final claim is that his "sentence [was] obtained by the use of an habitual felon

status in violation to the 8th Am." Pet. 10. In support, he appears to allege that his conviction and

resulting sentence as a habitual felon under North Carolina law resulted in a sentence which is

23

unconstitutionally disproportionate to the larceny crime for which he was convicted. Id. at 20-21;

Pet'r's Resp. [D.E. # 22] 14-16.

    The state court considered, and rejected this claim on direct appeal.

>     The sentence imposed upon Defendant in this case stemmed from the fact that he had accumulated seventeen prior record points, was subject to being sentenced as a Level V offender, and had attained habitual felon status. Defendant had achieved habitual felon status based upon convictions for felonious breaking and entering, breaking and entering a motor vehicle, and felonious larceny. Defendant was sentenced within the presumptive range set out in N.C. Gen.Stat. § 15A–1340.17(c). In view of the fact that the jury convicted Defendant of the substantive offense with which he had been charged, the fact that the jury determined that Defendant had attained habitual felon status, the fact that Defendant had a lengthy criminal record, and the fact that the sentence imposed upon Defendant was consistent with all applicable statutory provisions, we find no basis for overturning Defendant's sentence on appeal or for finding that the habitual felon statute, either facially or as applied to Defendant's situation, contravened the provisions of the United States and North Carolina Constitutions that prohibit the imposition of cruel and unusual punishment. As a result, we conclude that Defendant's constitutional challenge to his sentence lacks merit.

Robinson, 2011 WL 3891041 at *9. The state court properly recognized the limited reach of the

Eighth Amendment in non-capital sentencing contexts. In general, the Eighth Amendment requires

only that a sentence not be "grossly disproportionate" to the crime. Graham v. Florida, 130 S.Ct.

2011, 2021 (2010) (quoting Weems v. United States, 217 U.S. 349, 367 (1910)) ("The concept of

proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel

and unusual punishments is the 'precept of justice that punishment for crime should be graduated

and proportioned to the offense.'"). See also id. (quoting Harmelin v. Michigan, 501 U.S. 957, 997

(1991)) (Kennedy, J., concurring in part and concurring in judgment)) ("the Eighth Amendment

contains a 'narrow proportionality principle,' that 'does not require strict proportionality between

crime and sentence' but rather 'forbids only extreme sentences that are 'grossly disproportionate'

to the crime."). The Eighth Amendment's proportionality inquiry, therefore, is simply whether, "given all the circumstances in a particular case," "the sentence is unconstitutionally excessive." Id. Because this necessarily requires a fact-intensive, case-by-case approach, the Supreme Court has produced numerous decisions over the years upholding over proportionality challenges numerous sentences imposed for various crimes. See id. at 2021-22. Of particular salience to this case, and as recognized in Graham, the Supreme Court has rejected several Eighth Amendment challenges to aggravated sentences that were the product of state recidivist sentencing schemes. See id. (citing Ewing v. California, 538 U.S. 11 (2003)) (noting that the Court has "rejected a challenge to a sentence of 25 years to life for the theft of a few golf clubs under California's so-called three-strikes recidivist sentencing scheme"); see also id. (citing Rummel, 445 U.S. 263 (1980)) (noting that the Court has "upheld a sentence of life with the possibility of parole for a defendant's third nonviolent felony, the crime of obtaining money by false pretenses"). Id.. The state court explicitly relied upon Rummel in rejecting petitioner's Eighth Amendment challenge. Robinson, 2011 WL 3891041 at *8. The state court's decision therefore is neither contrary to or an unreasonable application of Supreme Court precedent, and it is not based upon an unreasonable determination of the facts before the court. Respondent is entitled to summary judgment on Ground Four.

IV. Certificate of Appealability

Having determined that respondent is entitled to summary judgment and the petition is due to be dismissed, the court must now consider whether petitioner is entitled to a certificate of appealability. See Rule 11 of the Rules Governing Section 2254 Cases ("Habeas Rules") ("the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). A certificate of appealability may issue only upon a "substantial showing of the

25

denial of a constitutional right." 28 U.S.C. § 2253 (c)(2). An applicant satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court likewise is debatable. See Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Slack v. McDaniel, 529 U.S. 473, 484 (2000); Rose v. Lee, 252 F.3d 676, 683-84 (4th Cir. 2001).

After reviewing the petition in light of the applicable standards, the court finds that reasonable jurists would not find the court's treatment of the petition debatable or wrong and that none of the issues are adequate to deserve encouragement to proceed further. Accordingly, petitioner is not entitled to a certificate of appealability.

## CONCLUSION

For the reasons stated above, respondent's motion for summary judgment [D.E. # 6] is GRANTED and the petition is DISMISSED. The court DENIES a certificate of appealability. The clerk of court is DIRECTED to close this case.

SO ORDERED. This the 21 day of March, 2013.

James C. Fox
JAMES C. FOX
Senior United States District Judge

26